IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 18, 2025 Session

**STATE OF TENNESSEE v. EARL DAVID MANEY**

**Appeal from the Criminal Court for Bradley County**
**No. 20-CR-369      Sandra Donaghy, Judge**

_____

**No. E2024-00649-CCA-R3-CD**

_____

The Defendant was charged with first degree premeditated murder after shooting and killing the victim during an argument. The Defendant was tried before a jury, and the trial court instructed the jury on the defense of self-defense. The jury convicted the Defendant of the lesser-included offense of voluntary manslaughter. The trial court sentenced the Defendant to five years of incarceration, suspended after the service of eleven months, twenty-nine days. In this direct appeal, the Defendant contends that the trial court erred in allowing an eyewitness to offer opinion testimony, simultaneously infringing on the Defendant's constitutional right to not testify, and that the trial court erred in ordering the Defendant to serve a portion of his sentence in confinement. We affirm the judgment of the trial court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and MATTHEW J. WILSON, J., joined.

Lee Davis, Chattanooga, Tennessee, for the appellant, Earl David Maney.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Joseph V. Hoffer and Lydia Braun, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background.** The proof at trial established that the Defendant owned and leased out commercial real estate in Cleveland, Tennessee. The Defendant was in his early 80s. One of the Defendant's commercial tenants was James Logan Fowler, who owned a business called Fowler Auto Sales. On Friday, April 17, 2020, cars were "burning out" on the street in front of Fowler Auto Sales. The act of "burning out" occurs "[w]hen you sit still and burn your tires" by "hold[ing] the brake and put[ting on] the gas." The Defendant

disapproved of this activity and complained to the police department about it. He also complained to Mr. Fowler about this activity and informed Mr. Fowler that he would be visiting Fowler Auto Sales on Monday, April 20, 2020, to conduct an inspection of the building. Mr. Fowler informed Tyler Collins about this upcoming inspection. Mr. Collins was an employee at a business called Glass Act Window Tinting owned by Mike Nunley. Glass Act was another of the Defendant's tenants and was located near Fowler Auto Sales. When Mr. Collins texted Mr. Fowler on Monday morning, "good luck with the building inspection," Mr. Fowler texted in response, "We're ready, son. The sh*t's gonna hit the fan." The events in this case arose out of that building inspection.

Mr. Fowler testified that he was currently the owner of Speedworx Motors, a business that bought and sold cars. Prior to Speedworx, Mr. Fowler owned and operated Fowler Auto Sales. He opened Fowler Auto Sales in 2017 at the age of nineteen. He rented the location of Fowler Auto Sales from the Defendant. Mr. Taylor Ballew became his partner in Fowler Auto Sales at the end of 2018. Both Mr. Fowler and Mr. Ballew were in their early 20s in April 2020.

Prior to the building inspection, Mr. Fowler had decided to end his lease with the Defendant. Mr. Fowler stated that the Defendant had complained to him about "burn outs" on more than one occasion. Mr. Fowler responded to the Defendant's complaints by pointing out that the roads were public. When the Defendant came to his business for the inspection on April 20, 2020, Mr. Fowler decided to record their conversation on his cell phone.

Mr. Fowler described the victim, Ricky Rogers, as a "long-time friend" of Mr. Ballew's family. Mr. Fowler stated that the victim "would stop in the shop every so often just to talk to [Mr. Ballew] and really just hang out and see what was going on." Mr. Fowler was not expecting the victim to visit his business on April 20, 2020. Nevertheless, the victim arrived on his motorcycle and sat on the sofa in Mr. Fowler's office.

When the Defendant arrived at Fowler Auto Sales, he began his inspection while holding a clipboard. After inspecting Fowler Auto Sales, Mr. Fowler and the Defendant walked to Glass Act, which was housed in the same building. There, they met Mr. Ballew and Mr. Nunley.

Mr. Fowler's cell phone recorded the conversations between himself, the Defendant, Mr. Ballew, and Mr. Nunley, and the recording was played for the jury. The recording demonstrates an argument between the men. Mr. Fowler testified that, while they were at Glass Act, the Defendant "swatted at" him with his clipboard but did not hit him with it. Mr. Fowler "jumped back," and Mr. Ballew "stepped in and said don't put your hands on

him." Mr. Fowler testified that the Defendant then grabbed Mr. Ballew and tried to hit him, dropping the clipboard in the process. Mr. Fowler continued:

[Mr. Ballew] grabbed [the Defendant] with both of his hands and just walked him to the back of the – of the [garage] bay and up against a table. And [the Defendant] was kicking and trying to hit him and get away from him. He fell off the table. And that's when I seen that he had his gun. And I told [Mr. Ballew] to get out. I said just get out.

According to Mr. Fowler, the gun he saw on the Defendant that day was bigger than the one Mr. Fowler had seen him carrying previously.

The Defendant recovered his feet and, as Mr. Fowler was preparing to leave the bay, the Defendant "come up behind me and grabbed me by the neck with both hands and was strangling me." The Defendant let go of Mr. Fowler and then "punched [Mr. Fowler] in the mouth." Mr. Fowler hit him back. The Defendant fell to the floor. When he regained his feet, the Defendant pulled his gun and pointed it at Mr. Fowler.

Mr. Fowler and the Defendant walked out of the building. The Defendant had his left hand around Mr. Fowler's jacket and was pointing his gun at Mr. Fowler with his right hand. The victim appeared and told the Defendant to let go of Mr. Fowler. The Defendant released Mr. Fowler, and Mr. Fowler walked away. Mr. Fowler joined Mr. Ballew in the street fronting the building. He then heard a gunshot. When he realized that the Defendant had shot the victim, Mr. Fowler called 911.

On cross-examination, Mr. Fowler acknowledged that the victim had told the Defendant that he (the victim) was going to "knock his [the Defendant's] a** out." He also acknowledged that, after the Defendant told the victim, "I'll hurt you," the victim responded, "Come on, hurt me, old man."

Taylor Ballew testified and acknowledged that he, Mr. Fowler, and Mr. Nunley, as well as others, all did "burnouts" on the street in front of Fowler Auto Sales. He explained that he had known the victim all his life and described the victim as his father's best friend. Mr. Ballew stated that the victim would stop by Fowler Auto Sales occasionally, "whenever he . . . wanted to," but that Mr. Ballew was not expecting him to stop by on April 20.

Mr. Ballew stated that, after he and Mr. Fowler and the Defendant walked down to Glass Act and joined Mr. Nunley, an argument ensued. Mr. Ballew testified that the Defendant told him, "I've got something for your bearded a**," which Mr. Ballew construed as a threat. Mr. Ballew tried to get the Defendant to join him outside the building,

but the Defendant declined. Mr. Ballew saw the Defendant swing his clipboard at Mr. Fowler, and Mr. Ballew told the Defendant, "don't f*ing touch him." The Defendant dropped the clipboard and walked toward Mr. Ballew. The Defendant grabbed Mr. Ballew and shoved, at which point Mr. Ballew grabbed the Defendant and shoved him into a table. The Defendant fell. At Mr. Fowler's insistence, Mr. Ballew walked out of the building. Mr. Ballew did not see a gun during this interaction. However, he heard a gunshot after he left the building.

On cross-examination, Mr. Ballew acknowledged that Mr. Fowler and the Defendant began arguing verbally while they were still at Fowler Auto Sales. Mr. Fowler told the Defendant, "you're full of f*cking sh*t." The argument continued at Glass Act because Mr. Fowler and Mr. Ballew were upset by something they heard about the Defendant's business interactions with Mr. Nunley, the owner of Glass Act. Mr. Ballew acknowledged that the Defendant had begun walking to his truck after the inspection of Fowler Auto Sales, but Mr. Ballew and Mr. Fowler told him they wanted him to meet with them at Glass Act to speak with Mr. Nunley. The Defendant complied, and all three men entered Glass Act, where Mr. Nunley was working.

Mr. Ballew acknowledged that, after the argument continued at Glass Act, the Defendant asked him to leave. Mr. Ballew refused to leave. Eventually, Mr. Ballew left the building, calling to the Defendant to come outside to fight. The Defendant refused Mr. Ballew's invitation, and Mr. Ballew re-entered Glass Act. Mr. Ballew stated that, after the Defendant swung a clipboard at Mr. Fowler, the Defendant "put his hands on" Mr. Ballew. At that point, Mr. Ballew shoved the Defendant, and the Defendant fell to the floor. Mr. Ballew explained that, during this physical altercation, Mr. Nunley was present but not involved.

After the Defendant fell to the floor, Mr. Fowler told Mr. Ballew to leave, and Mr. Ballew did so.

Mike Nunley testified that he had been running Glass Act Window Tinting for twenty-five years and had been leasing his business location from the Defendant for twenty years. He stated that there had been no problems in their relationship during that time. He also stated that he and his employee, Mr. Collins, visited Fowler Auto Sales and vice versa, with no problems between the men. The two businesses referred people to each other.

Approximately a month before the term of his lease ended, and prior to April 20, 2020, Mr. Nunley learned from the Defendant that their lease would not be renewed. The Defendant gave Mr. Nunley the option of leasing a different location. Mr. Nunley told Mr. Fowler and Mr. Ballew about the lease termination.

Mr. Nunley explained a "burnout" as "[w]hen you sit still and burn your tires" by "hold[ing] the brake and put[ting on] the gas." He stated that he had engaged in burnouts "[m]any times." He knew that the Defendant disapproved of this activity.

On April 20, 2020, the Defendant, Mr. Fowler, and Mr. Ballew all entered Glass Act. Their demeanor was "argumentative." The dispute centered around how much time the Defendant had given Mr. Nunley to relocate. Mr. Nunley stated that the Defendant had given him three weeks to a month. At that point, Mr. Nunley testified, the discussion between the other three men "got a little more heated."

After Mr. Ballew pushed the Defendant into Mr. Nunley's table, Mr. Nunley approached the Defendant to help him up, but the Defendant got up on his own. Mr. Nunley busied himself picking up items that had been knocked over or off of his table. When he looked back toward the other men, he saw that the Defendant "had [Mr. Fowler] by the throat." The two men then broke up, and Mr. Fowler and Mr. Ballew both left the shop. Mr. Nunley returned to work while the Defendant stood "at the front of the garage door." At that point, the victim, whom Mr. Nunley did not know, walked up.

Mr. Nunley heard the victim tell the Defendant, "quit picking on the kids." Mr. Nunley then saw the victim strike the Defendant with his right hand. The Defendant "slumped down a little bit up against the door." The victim backed up from the Defendant six or seven feet. Mr. Nunley did not hear the victim say anything. Mr. Nunley saw the Defendant pull out his gun from his side and shoot the victim with one shot. Asked for details, Mr. Nunley testified, "[the Defendant] pulled the gun out and held it, you know, for – for a few second[s], maybe five seconds. I don't know. And fired the shot." The victim had been facing the Defendant and was not moving anywhere. After shooting the victim, the Defendant "just kind of froze for a minute." Mr. Nunley called 911. The police arrived quickly and took the Defendant into custody.

On cross-examination, Mr. Nunley acknowledged that he had not seen a weapon that day until the Defendant drew his pistol. He acknowledged that, in his statement to the police made on April 20, 2020, he said that, after the Defendant pulled his gun, the victim "wasn't backing off." Mr. Nunley stated that, after the Defendant shot the victim, Mr. Nunley told him to "put the gun up," and the Defendant did so. The Defendant did not resist being taken into police custody.

Officer Tyler Doss took the Defendant into custody. While another officer conducted a gunshot residue test on the Defendant's hands, Officer Doss heard the Defendant say, "When someone knocks me down, I'm 82 years old, I ain't taking that sh*t." Officer Doss acknowledged that the Defendant was cooperative with the officers on the scene.

Detective Matthew Landolt of the Cleveland Police Department testified that he was the lead investigator in this matter. He reviewed photographs of the Defendant shown to him by the defense and acknowledged that these photographs depicted injuries to the Defendant. Detective Landolt acknowledged that these injuries were consistent with an altercation that took place between the Defendant and Mr. Ballew and Mr. Fowler on April 20, 2020, the day that the Defendant shot and killed the victim.

Savannah Houk, employed by the Tennessee Bureau of Investigation in the Firearm and Toolmark Identification unit, testified that the firearm collected from the Defendant was a Karh, model CW40, .40 caliber pistol. She examined the tee shirt recovered from the victim's body and determined that the distance between the end of the pistol's barrel and the victim's tee shirt was "greater than contact and less than six feet." That is, the gun barrel was not in contact with the victim's body when it was fired but was less than six feet away from the victim's body.

Dr. Darinka Mileusnic Polchan testified that she performed the autopsy on the victim. She opined that the victim's cause of death was a gunshot wound to his chest and that the manner of his death was homicide. The autopsy report reflects that the victim was 57 years old at the time of his death.

Although the record on appeal does not contain the opening statements or closing arguments, the record does include the trial court's instructions to the jury. Included in those instructions were the following:

**Self-Defense.** Included in the defendant's plea of not guilty is his plea of self-defense.

If a defendant was in a place where he had a right to be, he would have a right to threaten or use force against the deceased when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use or attempted use of unlawful force. The defendant would also have no duty to retreat before threatening or using force.

If a defendant was in a place where he had a right to be, he would also have a right to threaten or use force intended or likely to cause death or serious bodily injury if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon

reasonable grounds. The defendant would also have no duty to retreat before threatening or using force likely to cause death or serious bodily injury.

In determining whether the defendant's threat or use of force in defending himself was reasonable, you may consider not only his threat or use of force but also all the facts and circumstances surrounding and leading up to it. Factors to consider in deciding whether there were reasonable grounds for the defendant to fear death or serious bodily injury from the deceased include but are not limited to any previous threats of the deceased made known to the defendant; the character of the deceased for violence, when known to the defendant; the animosity of the deceased for the defendant, as revealed to the defendant by previous acts and words of the deceased; and the manner in which the parties were armed and their relative strengths and sizes.

The threat or use of force against the deceased would not have been justified if the defendant provoked the deceased's use or attempted use of unlawful force, unless the defendant abandoned the encounter or clearly communicated to the deceased the intent to do so, and the deceased nevertheless continued or attempted to use unlawful force against the defendant.

**"Force"** means compulsion by the use of physical power or violence. "Violence" means evidence of physical force unlawfully exercised so as to damage, injure or abuse. Physical contact is not required to prove violence. Unlawfully pointing a deadly weapon at an alleged victim is physical force directed toward the body of the victim.

**"Imminent"** means near at hand; on the point of happening.

**"Serious bodily injury"** means bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Bodily injury includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty.

The burden is on the state to prove beyond a reasonable doubt that the defendant did not act in **SELF-DEFENSE**.

To convict the defendant, the state must prove beyond a reasonable doubt that the defendant did not act in **SELF-DEFENSE**. If from all the facts and circumstances you find the defendant acted in **SELF-DEFENSE**, or if you have a reasonable doubt as to whether the defendant acted in **SELF-DEFENSE**, you must find him not guilty.

The trial court also instructed the jury as follows:

The defendant has not taken the stand to testify as a witness but you shall place no significance on this fact. The defendant is presumed innocent and the burden is on the state to prove his guilt beyond a reasonable doubt. He is not required to take the stand in his own behalf and his election not to do so, cannot be considered for any purpose against him, nor can any inference be drawn from such fact.

As to the offenses that the jury was instructed to consider, the trial court charged the jury as to the indicted offense, first degree premeditated murder, as well as the following lesser included offenses: attempt to commit first degree murder; second degree murder; attempt to commit second degree murder; voluntary manslaughter; attempt to commit voluntary manslaughter; reckless homicide; and criminally negligent homicide. After deliberating for several hours, the jury convicted the Defendant of the lesser included offense of voluntary manslaughter. See Tenn. Code Ann. § 39-13-211(a) (1990) ("the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner").

At the subsequent sentencing hearing, Detective Landolt testified that during the years 2016 to 2018, there were from zero to two homicides per year in the city of Cleveland, Tennessee. The number of homicides increased for the years 2019 and 2020, with five homicides being committed in 2019 and three homicides being committed in 2020. Detective Landolt opined that, according to Tennessee Bureau of Investigation statistics he reviewed, this increase in the rate of homicides during 2019 and 2020 was consistent with statewide statistics. On cross-examination, Detective Landolt acknowledged that there were fewer homicides committed in Cleveland in 2020 than in 2019.

Leigh Breedlove, the victim's daughter, submitted a victim-impact statement containing assertions by herself and the victim's ex-wife, her mother.

The defense submitted a sentencing memorandum and exhibits detailing the Defendant's multiple health problems, including a diagnosis of dementia. The defense also offered supportive letters from family members and proof of the Defendant's honorable

discharge from the United States Army in 1962. The Defendant also made an allocution, as follows:

> Well, I don't have a written statement or anything, program or anything like that, but I would say, Your Honor, to you and to the blood relatives of the man that attacked me, and I'm really sorry for his death. I protected my own life, and I worry about having to do what I did every day. I pray about it every day. I pray for him every day. I pray that he had time to ask for forgiveness before he passed.
>
> Other than that, the records are pretty clear. It was totally self-defense. I did what I had to do to survive. I'm sorry. But that's all I have to say.

During argument, the State asked the trial court to sentence the Defendant to a six-year term of incarceration. The defense argued for house arrest and contended that sentencing the Defendant, an 84-year-old man with dementia, to imprisonment would be a "death sentence."

Prior to issuing its ruling, the trial court noted statistics reflecting that Tennessee experienced a 31.99 percent increase in violent crime in 2020 compared to 2019. The trial court stated, "when crimes of violence occur in an area, the system has a duty to respond so that there is general deterrence to those involved in the case and anybody who might see the sentence." As to the Defendant's allocution, the trial court stated,

> [The Defendant] went on to say he was sorry for the death of [the victim]. That is not an expression of remorse for the action taken. It is an expression of loss perhaps to comfort the victims, but I don't think [the Defendant] is sorry for what he did. I think – can conclude even from his statements today and how he stated them that he felt as though he was acting well within his rights as a citizen to both bear arms and defend himself.
>
> So the real issue in this case is, I should say, his view of this entire thing was self-defense. The jury has clearly rejected a claim of self-defense, and – so [the Defendant] is not remorseful. [The Defendant] lacks remorse.

The trial court also noted that, "although [the Defendant] may be suffering from dementia," in his statement in the presentence report, the Defendant, "is detail-oriented, . . . descriptive and apparently has no loss of memory when it relates to the conduct from the day of this event."

As to enhancement factors, the trial court determined that enhancement was appropriate based on the Defendant's prior criminal history of a DUI conviction and by the Defendant's use of a deadly weapon to commit the offense. The trial court did not apply any mitigating factors. With respect to the Defendant's health, the trial court stated the following:

> I considered [mitigating] factor 13 [of Tennessee Code Annotated section 40-35-113], whether his health or his mental health should be one of those "any other factors" that should be used in the sentencing structure. And there's a reference, the defense relies heavily on his age, his dementia, diagnosis of dementia, to argue that he should have alternative sentencing, yet I saw a statement, almost an afterthought, in the State's memoranda that this defendant was aware and in control of his faculties at the time of this incident. And, quite frankly, since then, when I try to look at his entire life that is before me, I agree that a sentence of confinement would be a death sentence as to this defendant.

> His, his health, I guess what I'm trying to say, cuts both ways. He is not bad enough to not know and appreciate the wrongfulness of his action. He is able to live on his own, drive, manage his financial affairs, operate his business affairs, yet he bears this diagnosis.

> In spite of the diagnosis, it is clear to me from everything that is observed here that mental, his mental state or capacity did not affect his conduct and really has little weight in this sentencing structure.

The trial court determined that some period of confinement was necessary to avoid depreciating the seriousness of the offense or to provide an effective deterrence to others likely to commit similar offenses, citing Tennessee Code Annotated section 40-35-103(b). The trial court sentenced the Defendant as a Range I standard offender to a mid-range sentence of five years of incarceration, suspended upon the service of eleven months and twenty-nine days. See id. § 40-35-112(a)(3) (2010) (setting forth the Range I sentence for a Class C felony as "not less than three (3) nor more than six (6) years."). In response to the defense request for house arrest, the trial court stated, "were someone to receive a sentence of house arrest, although that is a deprivation of liberties, that is no punishment at all. It's a loss of liberty, which is a punishment. Being convicted of a felony is a punishment in and of itself. But for anybody who were to look at this behavior, house arrest under these circumstances would not be fair." The trial court continued, "a sentence of full probation would unduly depreciate the seriousness of the offense."

After the trial court announced the Defendant's sentence, the defense immediately made a motion that the Defendant's bond be continued pending the motion for new trial. The trial court denied the motion. The defense subsequently appealed the trial court's denial of the Defendant's bond, and this Court granted the appeal. The Defendant spent approximately two weeks in custody at the Bradley County jail prior to being released on his appeal bond.

The judgment of conviction was entered on August 15, 2022, and the Defendant timely filed a motion for new trial. In August 2023, the Defendant filed a "Motion for Reconsideration of Sentencing" based upon further health problems and the difficulties he had experienced while in custody. A hearing was held on this motion, and the trial court denied it by written order entered on April 30, 2024. In this appeal, we do not consider the trial court's denial of the "Motion for Reconsideration of Sentencing[.]" See State v. Martin, No. E2014-00738-CCA-R3-CD, 2015 WL 395664, at *4 (Tenn. Crim. App. Jan. 30, 2015) ("A motion to reconsider is not contemplated by the Tennessee Rules of Criminal Procedure.") (citing State v. Turco, 108 S.W.3d 244, 245 n.2 (Tenn. 2003)); see also Prendergast v. State, No. M2013-02869-CCA-R3-ECN, 2015 WL 9488423, at *5 (Tenn. Crim. App. Dec. 29, 2015) ("[W]e reiterate that a motion to reconsider is simply not authorized by the Tennessee Rules of Criminal Procedure.") (citations omitted). While a defendant may file a motion for a reduction of his sentence, see Tenn. R. Crim. P. 35(a), such a motion must be filed "within 120 days after the date the sentence is imposed," id. "No extensions shall be allowed on the time limitation." Id. We are, therefore, without jurisdiction to consider the trial court's denial of the Defendant's "Motion for Reconsideration of Sentencing." We note, however, that "[a]t any time during the period of continuous confinement ordered pursuant to [a sentence of split confinement], the defendant may apply to the sentencing court to have the balance of the sentence served on probation supervision. The application may be made at no less than two-month intervals." Tenn. Code Ann. § 40-35-306(c) (1989).

Accordingly, we consider only the matters raised on appeal from the trial court's denial of the Defendant's motion for new trial, which was denied on April 26, 2024. The Defendant timely filed his notice of appeal, and this matter is now properly before this Court.

## ANALYSIS

**Opinion Testimony.** In his first issue, the Defendant contends that the trial court erred by allowing the State to elicit opinion testimony from Mr. Nunley, which error also violated his Fifth Amendment right to not testify. We disagree.

During the State's direct examination of Mr. Nunley, the following exchange occurred:

- 11 -

Q. Okay. Describe for the jurors at the time that Defendant Maney pulled the trigger what kind of threat was [the victim] presenting?

[Defense Counsel]: Objection. Calls for speculation about a threat [the victim] is to [the Defendant].

[The State]: I'll rephrase it, Your Honor.

The Court: Thank you.

Q. At the time that Defendant Maney pulled the trigger describe for the jurors any threat you saw that [the victim] was presenting to the defendant.

[Defense Counsel]: Objection, Your Honor. He has no way of knowing what kind of threat he is making to [the Defendant].

[The State]: I'm not asking about verbal. I said what kind of threat did he see.

[Defense Counsel]: He's calling for state of mind, Your Honor. He cannot possibly testify to state of mind of the defendant.

[The State]: I'm asking him to describe a physical phenomena that was before him and within his eyesight, Your Honor, whether there was a visible threat.

[Defense Counsel]: He's asking this man to make a statement that leads to impressions that this man is forming in his mind and he can't do that.

The Court: To the extent that it calls for what's going on in [the Defendant's] mind I'm going to sustain. To the extent that it calls for things that he saw he may answer that question.

[The State]: And to be specific, Your Honor, if I may [ask] what did he see [the victim] –

The Court: Do.

[The State]: -- as a threat at that time.

The Court:  So, sir, you may answer that question.

[Mr. Nunley]:  Okay.  I didn't see any threat at that time.

Defendant now argues that Mr. Nunley's testimony was "improper lay opinion testimony about [the Defendant's] perception of a threat," citing Tennessee Rule of Evidence 701(a).  Tennessee Rule of Evidence 701(a) provides that, "[i]f a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."  The State responds that the Defendant has waived this ground of objection because he did not raise it at trial, nor does he seek plain error review of this alleged error.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record."  State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)).  A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'"  Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).  Furthermore, we agree that a party on appeal is bound to the ground of the objection it asserted at trial.  See State v. Schiefelbein, 230 S.W.3d 88, 129 (Tenn. Crim. App. 2007) (citing State v. Adkisson, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994); Tenn. R. Evid. 103(a)(1)).

At trial, the Defendant objected to the State's questions to Mr. Nunley as calling for speculation.  Tennessee Rule of Evidence 602 provides that witnesses "may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Thus, to the extent the State was asking Mr. Nunley about the Defendant's perception of any threats the victim may have been engaging in, an objection to speculation was appropriate.  Indeed, the trial court sustained the Defendant's objection to this extent.

In our view, the Defendant misperceives the question posed to Mr. Nunley.  Mr. Nunley was not asked about either his knowledge or his opinion of the Defendant's perceptions regarding the victim.  Mr. Nunley was asked about his own perceptions of the victim's conduct at the time the Defendant shot him.  The prosecutor was asking Mr. Nunley to report on whether he himself perceived the victim to be engaging in any threatening conduct at the time the Defendant pulled the trigger.  When an eyewitness

provides descriptive testimony about what they saw the victim do, albeit threatening or non-threatening behavior, this typically involves describing observable conduct — such as aggressive movements, gestures, or actions — that the witness personally perceived. We acknowledge that the distinction between descriptive testimony and opinion testimony can be subtle. While descriptive testimony conveys observable facts, opinion testimony synthesizes those observations into a legal conclusion. In our view, the prosecution was asking Mr. Nunley for descriptive testimony, not opinion testimony. The question did not call for speculation in violation of Tennessee Rule of Evidence 602 or improper lay opinion testimony in violation of Tennessee Rule of Evidence 701. Even if Mr. Nunley's testimony fell within the scope of Rule 701, we conclude that it was rationally based on Mr. Nunley's perception and firsthand knowledge of the offense and helpful to a clear understanding of his testimony. Accordingly, the trial court did not err in allowing the question to be asked.

As set forth above in the trial court's instruction to the jury, and as recognized by the defense in its brief to this Court, a claim of self-defense[1] requires that the person claiming self-defense had "a reasonable belief that there is an imminent danger of death or serious bodily injury" *and* that the belief of danger "is founded upon reasonable grounds." Tenn. Code Ann. § 39-11-611(b)(2) (2017). That is, the defense of self-defense depends on both the claimant's subjective state of mind *and* a determination of whether that state of mind was objectively reasonable. See, e.g., State v. Gaines, No. M2023-01389-CCA-

---

[1] We note that the Defendant states in his brief to this Court that he relied on the "affirmative defense" of self-defense. As our Supreme Court has pointed out,

> Tennessee makes a technical distinction between general defenses and affirmative defenses. The distinction is important because "affirmative defenses," which are specifically labeled as such, (1) require pre-trial notice, and (2) once "fairly raised" and submitted to the jury, must be proven by the defendant by a preponderance of the evidence (rather than disproved by the State beyond a reasonable doubt). See Tenn. Code Ann. §§ 39-11-203 (general defenses), -204 (affirmative defenses). Self-defense, defense of another, duress, necessity, and mistake of fact are examples of general defenses. See State v. Bledsoe, 226 S.W.3d 349, 355-56 (Tenn. 2007) (duress); State v. Green, 995 S.W.2d 591, 604-06 (Tenn. Crim. App. 1998) (duress and necessity); State v. Parker, No. M2009-02448-CCA-R3-CD, 2011 WL 51734, at *20 (Tenn. Crim. App. Jan. 6, 2011) (mistake of fact), perm. app. denied (Tenn. May 26, 2011); State v. Blackwood, No. W1999-01221-CCA-R3-CD, 2000 WL 1672343, at *9-10 (Tenn. Crim. App. Nov. 2, 2000) (self-defense, necessity, mistake of fact, and defense of another), perm. app. denied (Tenn. May 21, 2001). We encourage attorneys and judges to refrain from blurring the distinction between general defenses and "affirmative" defenses.

State v. Hawkins, 406 S.W.3d 121, 129 n.9 (Tenn. 2013). We acknowledge that this Court has also, on occasion, referred to the general defense of self-defense as an "affirmative defense." See, e.g., State v. Scott, No. E2015-01772-CCA-R3-CD, 2017 WL 568547, at *7 (Tenn. Crim. App. Feb. 13, 2017); State v. Randolph, No. M2011-01130-CCA-R3-CD, 2012 WL 12932499, at *3 (Tenn. Crim. App. July 12, 2012). We take this opportunity to correct this mislabeling.

R3-CD, 2025 WL 1514049, at *6 (Tenn. Crim. App. May 28, 2025) (recognizing that, as to a defendant claiming self-defense, the defendant's "conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under this statutory defense [of self-defense]") (citing State v. Bult, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998)), perm. appeal denied (Tenn. Oct. 8, 2025). Mr. Nunley was not being asked whether the Defendant believed that he was in imminent danger of death or serious bodily injury; rather, the State was eliciting proof regarding whether there were reasonable grounds for the Defendant to hold such a belief. In this case, the Defendant and Mr. Nunley observed the victim's conduct. Mr. Nunley's perception of whether the victim was engaged in threatening behavior was relevant to a determination of objective reasonableness. The trial court did not err in allowing the question, and the Defendant is not entitled to relief on this ground.

The Defendant also argues that Mr. Nunley's testimony infringed on his Fifth Amendment right to not testify. See U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself"); see also Tenn. Const. art. I, § 9 ("in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself"); State v. Jackson, 444 S.W.3d 554, 587 (Tenn. 2014) (recognizing that both direct comments on and indirect references to an accused's choice to remain silent can violate the privilege against self-incrimination). He argues in his brief before this Court, "[Mr. Nunley's] testimony created a confusing impression for the jury that Mr. Nunley could judge the threat [the Defendant] perceived. This testimony also improperly put the jury into Mr. Nunley's shoes rather than [the Defendant's] when judging whether or not the threat of imminent danger of serious bodily injury or death existed."

We agree with the State that this issue is waived because this ground for objection was not raised in the trial court. See Schiefelbein, 230 S.W.3d at 129; see also Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Moreover, as the State points out in its brief, neither the prosecutor nor Mr. Nunley commented upon the Defendant's choice to remain silent. Additionally, as set forth above, the trial court instructed the jury that it was to place no significance on the fact that the Defendant did not testify, that it was to presume the Defendant innocent, and that the State bore the burden to prove his guilt beyond a reasonable doubt. The trial court told the jury that the Defendant was not required to take the stand in his own behalf and that his election not to do so "cannot be considered for any purpose against him, nor can any inference be drawn from such fact." We presume that the jury follows its instructions. See State v. Harbison, 539 S.W.3d 149, 163 (Tenn. 2018). The Defendant is not entitled to relief on this basis.

**Sentencing.** The Defendant next contends that the trial court erred in sentencing him to serve in confinement eleven months and twenty-nine days of his five-year sentence. The Defendant asserts that the trial court failed to give due weight to his age and declining health; relied on improper factors in concluding that a sentence of split confinement would serve as a deterrent; and improperly concluded that his "continued belief in his self-defense claim" demonstrated a lack of remorse rather than a basis for mitigation. The State responds that the Defendant has failed to carry his burden of proving that the trial court abused its discretion by ordering a sentence of split confinement.

Prior to imposing sentence, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1)     The evidence, if any, received at the trial and the sentencing hearing;

(2)     The presentence report;

(3)     The principles of sentencing and arguments as to sentencing alternatives;

(4)     The nature and characteristics of the criminal conduct involved;

(5)     Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6)     Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7)     Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8)     The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b) (2017). Additionally, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. § 40-35-102(3)(C) (2010), -103(5) (2019). With respect to a sentence involving incarceration, our legislature has recognized that a trial court may consider confinement to be necessary "to avoid depreciating the seriousness of the offense" or where confinement is "particularly suited to provide an effective deterrence to others likely to commit similar offenses." Id. § 40-35-103(1)(B). As to the end result, the trial court must impose "a sentence justly deserved in relation to

the seriousness of the offense," id. § 40-35-102(1), but "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

With respect to a sentence of probation, "the burden of establishing suitability for probation rests with the defendant." Tenn. Code Ann. § 40-35-303(b) (2018). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)) (internal quotation marks omitted). The factors relevant to the issue of whether to impose probation include "(1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value." State v. Trent, 533 S.W.3d 282, 291 (Tenn. 2017) (citing State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)). A trial court may reject a sentence of full probation where it "will unduly depreciate the seriousness of the offense." State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996).

Our Supreme Court has stated that, on review, we should uphold a trial court's sentencing decision "so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Our current sentencing statutes have "rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by–but not bound by–any applicable enhancement or mitigating factors when adjusting the length of a sentence." Id. Because of this broad discretion, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from" the 1989 Sentencing Act, as amended in 2005. Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id.

Accordingly, this Court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. This same standard of review applies to questions related to probation. State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). In appealing his sentence to this Court, the Defendant has the burden of demonstrating the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

- 17 -

The crux of the Defendant's argument is that the trial court abused its discretion when it declined to sentence him to full probation.[2] The Defendant contends that the trial court erred in concluding that a period of confinement was appropriate for deterrence purposes. We disagree. At the sentencing hearing, the trial court considered statistics introduced by the State that indicated a statewide increase in homicides from 2019 to 2020, the year in which the instant crime was committed. As to this evidence, the trial court stated, "when crimes of violence occur in an area, the system has a duty to respond so that there is general deterrence to those involved in the case and anybody who might see the sentence." Indeed, our Supreme Court has recognized that confinement for deterrence purposes may be appropriate where "other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole." State v. Hooper, 29 S.W.3d 1, 10 (Tenn. 2000). The trial court did not err in considering the need for general deterrence as a factor in denying the Defendant full probation.

The trial court also noted a need to avoid depreciating the seriousness of the offense. As to this latter concern, the trial court emphasized that the Defendant "killed a man, which is the most serious thing that someone can do." Thus, the trial court determined that, not only was full probation not appropriate, but "house arrest under these circumstances would not be fair." As set forth above, a trial court may reject a sentence of full probation where it "will unduly depreciate the seriousness of the offense." Boggs, 932 S.W.2d at 477.

The Defendant also complains that the trial court misconstrued his allocution as demonstrating a lack of remorse rather than the Defendant's "continued belief in his need to defend himself." While we agree that it may be unlikely for a defendant to abandon his claim of self-defense simply because a jury found differently, we reject the Defendant's claim that the trial court should have considered as a *mitigating* factor his continued insistence that he had killed the victim in self-defense. Had the trial court found the Defendant's claim of self-defense meritorious, it would have set aside the jury's verdict as the thirteenth juror and acquitted the Defendant. See State v. Smith, No. 02C01-9412-CR-00270, 1996 WL 89389, at *4 (Tenn. Crim. App. Feb. 29, 1996) ("The jury rejected the [defendant's] claim of self-defense. The trial court, having approved the verdict, could not have used the [defendant's] statement that he acted in self-defense as a mitigating factor."). Moreover, a claim of self-defense is not inherently incompatible with remorse. In Smith, the defendant's sentence was mitigated on the basis of his remorse because, "although still professing that he killed the victim in self-defense, . . . [he] expressed remorse for the killing." Smith, 1996 WL 89389, at *2, 4; see also, e.g., State v. Martin, No. 02C01-9408-CC-00170, 1995 WL 512089, at *8 (Tenn. Crim. App. Aug. 30, 1995) (noting that the

---

[2] This Court has described "house arrest," which the Defendant requested in lieu of confinement to a jail facility, as "intensive probation, in-house arrest circumstances." See State v. Ring, 56 S.W.3d 577, 579 (Tenn. Crim. App. 2001); State v. Blackhurst, 70 S.W.3d 88, 92 (Tenn. Crim. App. 2001).

defendant had "expressed remorse for having killed the victim although she maintained in her statement in the presentence report that she acted in self-defense").

The trial court was in a position to see and listen to the Defendant during the trial and the sentencing hearing, including his allocution. The record does not demonstrate that the trial court abused its discretion in finding that the Defendant lacked remorse. This Court has long recognized that a defendant's lack of remorse "has a direct [negative] bearing on a defendant's prospect for rehabilitation." State v. Richerson, 612 S.W.2d 194, 196 (Tenn. Crim. App. 1980). Accordingly, this factor also weighed against a grant of full probation.

Finally, the Defendant mentions in his brief that applicable mitigating factors included that he acted under strong provocation, substantial grounds tended to excuse or justify his crime, and that he committed the offense "under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." See Tenn. Code Ann. § 40-35-113(2), (3), (11). The trial court appeared to reject mitigation on these grounds on the basis that they were subsumed by the jury's verdict of voluntary manslaughter. The Defendant further contends that the trial court "failed to give proper weight to the mitigating factor of [the Defendant's] deteriorating physical and cognitive health." In support, the Defendant relies on this Court's decision in State v. Poston, No. E2011-00106-CCA-R3-CD, 2012 WL 690214 (Tenn. Crim. App. Mar. 5, 2012).

In Poston, the defendant was indicted for second degree murder and pleaded guilty to reckless homicide after he shot and killed his adult step-son during an argument. Id. at *1. The defendant and the State agreed that the defendant would receive a two-year sentence with the manner of service to be determined by the trial court. Id. After a hearing, the trial court ordered the defendant to serve his entire sentence in confinement because "'[c]onfinement [was] necessary to avoid depreciating the seriousness of the offense or confinement [was] particularly suited to provide an effective deterrence to others likely to commit similar offenses.'" Id. at *4. On appeal, this Court reversed the trial court on the grounds that "no proof was presented at the sentencing hearing regarding the need to deter others from committing similar offenses," id. at *7, and because the nature of the offense "did not outweigh all other factors favoring an alternative sentence," id. This Court determined that the defendant had satisfied his burden of establishing his suitability for full probation, id., and modified the defendant's sentence to supervised probation, id. at *8.

In modifying the defendant's sentence, this Court stated the following:

Viewing the record as a whole, we give weight to the fact that [the defendant] has no criminal history, is physically disabled, has significant health problems that require him to be regularly seen by doctors and treated

with approximately thirty prescriptions, has dementia, has expressed remorse for his crime, has fully cooperated with law enforcement, has supportive family members who help take care of him, has no history of drug or alcohol use, and had a consistent work history prior to becoming disabled. . . . Most importantly, we give great weight to the fact that [the defendant] is a good candidate for rehabilitation.

Id. at *8. We note that the defendant in Poston expressed remorse for his actions, testified that he had been afraid of the victim, who had hit him with a wooden board, and "acknowledged he should receive some punishment because he took the victim's life." Id. at *3.

Initially, we note that this case is distinguishable from Poston in several regards. First, the defendant in Poston pleaded guilty to reckless homicide, a lesser crime than voluntary manslaughter.[3]  Second, unlike the trial court in Poston, the trial court in this case did sentence the Defendant to an alternative sentence, that of split confinement. Third, unlike the trial court in Poston, the trial court in this case had proof upon which to find a need for general deterrence. Fourth, unlike the Defendant, the defendant in Poston expressed remorse and acknowledged that he was deserving of punishment for his crime, in spite of his claim that he had acted in self-defense, making him a good candidate for rehabilitation. Finally, Poston was decided in 2012, prior to our Supreme Court's decision in Bise, which significantly expanded the deference this Court must afford a trial court's sentencing decisions.

We recognize that, like the defendant in Poston, the Defendant suffers from multiple medical ailments, including dementia, for which he requires ongoing care. The Defendant's medical needs, however, are not, in and of themselves, a basis for a sentence of full probation.

In sum, the trial court's reasoning for imposing a sentence of split confinement is supported by the record, and the Defendant has failed to demonstrate that the trial court abused its discretion in sentencing him. Accordingly, we affirm the trial court's sentence.

## CONCLUSION

We affirm the trial court's judgment.

s/ **Camille R. McMullen**
CAMILLE R. MCMULLEN, JUDGE

---

[3] At the time the Defendant killed the victim, voluntary manslaughter was a Class C felony, Tenn. Code Ann. § 39-13-211(b) (1990), while reckless homicide is a Class D felony, id. § 39-13-215(b) (1993).